J-S40005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RENEE M. BRUDER, | |
| Appellant | No. 1282 WDA 2018 |

Appeal from the Judgment of Sentence Entered August 7, 2018
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0007513-2017

BEFORE:  BENDER, P.J.E., MCLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED SEPTEMBER 30, 2019**

Appellant, Renee M. Bruder, appeals from the judgment of sentence of 3 years' probation, imposed after a jury convicted her of insurance fraud.  We are compelled to affirm, and additionally grant her counsel's petition to withdraw.[1]

Appellant was charged with insurance fraud, 18 Pa.C.S. § 4117(a)(2); criminal attempt-insurance fraud, 18 Pa.C.S. § 901(a); false reports to law

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On August 22, 2019, Appellant's counsel — Anne Puluka, Esq. — filed a petition for leave to withdraw as counsel, stating that she is resigning from her position within the Allegheny County Office of the Public Defender.  We grant her petition to withdraw as counsel, and note that the Allegheny County Office of the Public Defender, through Deputy Brandon Ging, Esq., will remain as counsel for Appellant.  **See** Petition for Leave to Withdraw as Counsel, 8/22/2019, at 1-2.

enforcement, 18 Pa.C.S. § 4906(b)(1); and operating a vehicle without required financial responsibility, 75 Pa.C.S. § 1786(f). Appellant's case proceeded to a two-day trial in August of 2018. Immediately before the beginning of trial, the Commonwealth withdrew the charge of criminal attempt-insurance fraud. N.T. Trial, 8/6/2018-8/7/2018, at 3.[2]

At trial, Officer Eric Porter of the Ingram Borough Police Department testified that, on December 17, 2016, at approximately 2:02 p.m., he came upon a motor vehicle accident involving two motor vehicles on Steuben Street. *Id.* at 32-33. He described that Appellant's Honda Pilot had struck a vehicle that had been traveling in the opposite direction on Steuben Street. *Id.* at 33-34. Officer Porter said that he subsequently learned that the vehicle that Appellant had struck was deemed totaled. *Id.* at 35. After ensuring that there were no injuries, Officer Porter said he collected pertinent information from the parties involved, but then had to leave the scene due to an emergency call. *Id.* at 34. Officer Porter recalled that Appellant had provided him with a policy number from Nationwide Insurance ("Nationwide"). *Id.* at 34-35.[3]

The following day — December 18, 2016 — Officer Porter explained that he called Appellant to follow-up on the accident and gather more information about her insurance since he had to leave the scene to respond to another

---

[2] It is unclear from the record why the Commonwealth withdrew this charge.

[3] We refer to this insurance policy herein as "the prior policy."

call.  *Id.* at 35-36.  He testified that Appellant told him that she had "provided [him] with the wrong insurance information and that she didn't realize she had an old insurance card that she [had] handed" him.  *Id.* at 36.  Officer Porter stated that Appellant then gave him a new insurance policy number, and made no mention that the insurance card she had handed him the day before had been canceled.  *Id.* at 36-37.  Officer Porter explained that Appellant's new insurance policy was with Titan Insurance, a branch of Nationwide.  *Id.*  Appellant did not tell Officer Porter when she obtained that particular policy and did not provide any other information to him at that time. *Id.* at 37.

Michelle La Rue, Appellant's insurance agent, testified next.  *Id.* at 43, 44.  She conveyed that, on December 17, 2016, at around 3 or 4 p.m., Appellant called her, stating that she had learned that her prior policy through 'Nationwide Standard' had been canceled and that she needed insurance.  *Id.* at 45, 47.  Ms. La Rue did not know the exact date of when Appellant's prior policy had been canceled, but stated it was before December 17, 2016, and canceled due to the nonpayment of the premium.  *Id.* at 46.  Ms. La Rue said she explained to Appellant that she would have to obtain new insurance through Titan, which is Nationwide's 'nonstandard policy,' because "[a]ny time that you have lapsing coverage, you have to go to a different type of policy." *Id.* at 46-47.  Ms. La Rue said she gave Appellant a quote.  *Id.* at 46.  During the phone call, Ms. La Rue said Appellant "seemed pretty frantic, upset, … like something was wrong."  *Id.*  When Ms. La Rue asked Appellant what was

wrong, Ms. La Rue relayed that Appellant "said she just needed insurance, she needed coverage. She didn't have coverage." *Id.* at 46-47.

After talking with Appellant, Ms. La Rue described that she then started processing the new policy and, at around 5:31 p.m. that day, Appellant's new policy with Nationwide was 'bound.' *Id.* at 47-48, 52. Ms. La Rue asserted that Appellant met with her to sign the new policy that same day at approximately 5:45 p.m. *Id.* at 52-53. Ms. La Rue testified that Appellant did not mention anything to her about having been involved in an accident a couple hours prior to calling her. *Id.* at 55. Ms. La Rue stated that, if Appellant had told her that information, it would have raised the premium rate she had quoted to Appellant, but Appellant could not have claimed that accident on her new policy. *Id.* at 55-56. Ms. La Rue said that Appellant did not try to make a claim for the accident with her and stated that she does not handle claims. *Id.* at 58. Ms. La Rue advised that, when applying for insurance, the applicant should provide information about prior accidents by calling the claims department. *Id.* at 59-61. She also noted that Appellant's new policy provided "the basic[,] bare minimum policy coverage." *Id.* at 61.

Thereafter, the Commonwealth called Thomas Cesario, an investigator employed by Nationwide, to testify. *Id.* at 63-64. He explained that he had reviewed the claim made by Appellant in this case, and said that the other vehicle involved in the accident had sustained about $16,000 in damages, which Nationwide would have been responsible for repairing if Appellant's new policy were in effect. *Id.* at 67-68. During the course of Mr. Cesario's direct

examination, the Commonwealth played three audio recordings for the jury.[4] The first recording consisted of Mr. Cesario's interview with Appellant on January 27, 2017. *Id.* at 70; Commonwealth's Exhibit 2.[5] During that recorded interview, Mr. Cesario directed Appellant's attention to the police's accident report, which he observed indicated that the accident occurred on Saturday, December 17, 2016. Commonwealth's Exhibit 2. Mr. Cesario then asked Appellant if the accident occurred around 2 p.m. that day, and Appellant answered that she did not remember what time it happened. *Id.* In response, Mr. Cesario explained that the police marked the dispatch time on the accident report as 2:02 p.m., and remarked that the accident report imparted that Appellant had no insurance. *Id.* Appellant told him how the insurance company informed her that her prior policy had been canceled, and she consequently contacted her agent to procure new insurance. *Id.* She added that she had mailed a check to the insurance company to pay for her prior policy, but the insurance company claimed it never received it. *Id.* She said the mail was not returned, and that she did not have a copy of the check, nor

_____

[4] For clarity, the Commonwealth presented these recordings to the jury in reverse chronological order from when they transpired, *i.e.*, the first recording played was from about a month after the accident, and the last recording played contained Appellant's conversation with the customer service representative she initially talked to two days after the accident.

[5] Although Appellant sets forth in her brief that this interview took place on December 27, 2016, *see* Appellant's Brief at 9, Mr. Cesario noted the date of the interview as Friday, January 27, 2017, in the recording. *See* Commonwealth's Exhibit 2; *see also* N.T. at 84 (testifying that the interview occurred in January of 2017).

the check ledger, to show she had written the check. *Id.* Mr. Cesario then stated that he obtained a copy of Appellant's new policy, which demonstrated that it was put into effect on December 17, 2016 at 5:31 p.m. *Id.* Appellant responded that she is not good with times, especially on that particular day, but believed Mr. Cesario as to the time. *Id.* Mr. Cesario then asked Appellant what happened after she obtained the new policy. *Id.* Appellant said she did not understand what he meant, and that nothing happened. *Id.* Mr. Cesario then questioned if Appellant called and made a claim on the accident after she received her new policy. *Id.* Appellant replied that she knows she has to pay to fix her car herself and that "everybody knows" that she did not have insurance at the time of the accident. *Id.* Mr. Cesario then repeated that Appellant obtained a new policy, which went into effect after the accident, and then made a claim for the damages to her vehicle. *Id.* In response, Appellant declared that she did not make a claim for the damages to her vehicle, but had just called the insurance company and said she was in an accident. *Id.* Appellant insisted that she was not calling to ask the insurance company to fix her car. *Id.* She explained that she thought she did what she was supposed to do. *Id.* When Mr. Cesario subsequently began to ask about when she called the insurance company, Appellant claimed she did not remember anything else and ended the interview with Mr. Cesario. *Id.*

After this recording was played for the jury, Mr. Cesario testified that he had also obtained an audio recording of Appellant's conversation with a claims representative on December 19, 2016. N.T. at 70-71, *see also*

- 6 -

Commonwealth's Exhibit 3. Mr. Cesario detailed how the claims process begins, as follows:

> What happens is [the claimant will] call the 800 number. I'm sure many of you have experienced this. They call the 800 number. You give the customer service representative the information about what happened, where it happened, what day it happened, what time it happened. Once they get that preliminary information, they assign a claim number. And they assign a claims representative. And that's the end part of that phone call.
>
> Whenever it's transferred to the claims representative, that's when the reporting ends. We call it a first notice of loss call.

N.T. at 71.

The Commonwealth then played a second recording to the jury, which encompassed Appellant's telephone conversation with claims representative, Bridget Fitzpatrick. Commonwealth's Exhibit 3. In that conversation, Ms. Fitzpatrick asked Appellant about the damages to her vehicle from the December 17, 2016 accident. *Id.* Appellant answered that her vehicle had front-end damage. *Id.* Ms. Fitzpatrick then inquired if there was any other previous damage to the vehicle from prior accidents that Appellant had not yet repaired. *Id.* Appellant replied that her driver's side door had been damaged, but was since repaired. *Id.* Appellant then described the December 17, 2016 accident to Ms. Fitzpatrick. *Id.* When Ms. Fitzpatrick asked what time the accident occurred on December 17, 2016, Appellant stated she had "no idea." *Id.* Ms. Fitzpatrick probed if it was morning or nighttime, and Appellant answered it was in the "evening." *Id.* Ms. Fitzpatrick asked if it was still light outside, and Appellant answered yes. *Id.* Ms. Fitzpatrick then

questioned Appellant if she would say it was closer to early afternoon, and Appellant indicated that she was "pretty sure" it was. *Id.* Appellant then apologized and said she is just so "shook over this." *Id.* After posing a few more questions, Ms. Fitzpatrick asked whether there was anything else Appellant wanted to add before Ms. Fitzpatrick ended the recording. *Id.* Appellant responded that she could not remember anything. *Id.* Appellant then acknowledged that everything she said in the statement was true and correct. *Id.*

After this recording was played at trial, Mr. Cesario then testified that he had obtained another, third recording labeled 'First Notice of Loss' in the course of his investigation, which he described as "the initial call whenever our insured or a claimant would call in and open a claim." N.T. at 79. In that third recording from December 19, 2016, the customer service representative greeted Appellant and asked how she could assist her today. Commonwealth's Exhibit 4. Appellant stated that she "was in an accident." *Id.* After requesting some biographical information from Appellant, the representative asked Appellant for the date and time of the accident. *Id.* Appellant answered that it was on Saturday, and said she did not remember the time. *Id.* Appellant then interjected that she has a policy number and then gave the representative her new policy number. *Id.* The representative said that she did not have that policy number. *Id.* The representative asked if Appellant had a new, updated policy number, and Appellant indicated yes and gave her the number. *Id.* The representative said she could not find the new policy

number in her system. *Id.* Appellant then stated that she got a new policy number on Saturday, and then later that day, she was in an accident. *Id.* The representative could not find the policy number in the system, but offered to file an 'unverified claim' for the policy number Appellant submitted. *Id.* Appellant told the representative that she was "shaking" and asked what other information the representative needed. *Id.* The representative then gathered some basic information to file the claim. *Id.* At the end of the call, the representative gave Appellant a claim number and an adjuster's name. *Id.*

After the third recording concluded, Mr. Cesario testified that letters of cancellation normally are sent 30 days in advance of the policy being canceled. N.T. at 81. In this instance, Mr. Cesario explained that Nationwide canceled Appellant's policy because of an unpaid premium. *Id.* On cross-examination of Mr. Cesario, it was established that Appellant's policy had lapsed on December 15, 2016 — two days before the accident. *Id.* at 86.[6] Mr. Cesario also noted that the estimate of damages to the other vehicle was not available to him until December 21, 2016. *Id.* at 87.

Finally, Appellant testified. *Id.* at 94-95. She stated that she is fifty-three years old and has an eighth grade education. *Id.* at 95. She explained that, at the time of the accident, she thought she had insurance, and did not find out that her insurance had been canceled until she called her insurance

---

[6] Although the parties agreed on the record that Appellant's prior policy was canceled on December 15, *2017*, we suspect that they intended to mean December 15, *2016*. N.T. at 86; *see also* N.T. at 58, 81-82.

company to report the accident when she got home. *Id.* at 96. When she found out she was not insured, she "freaked and cried[,]" and called her insurance agent "because [she] had other vehicles that I knew … were out on the road that needed insurance." *Id.* at 96-97. Appellant said that she did not try to make a claim with Ms. La Rue at any point. *Id.* at 97. Appellant went on to recall that, on December 18, 2016, she received a call from Officer Porter, who told her that she did not have insurance. *Id.* at 98. She recounted:

> He told me that I didn't have insurance. And I said[,] "Yes," I did. … He didn't say, "You didn't have insurance at that moment [of the accident]." Because he says, "You don't have insurance." And at that moment, I got new insurance[,] so I said, "Yes, I did. I have insurance. And this is the insurance policy."

*Id.* She added that she did not tell him when she obtained her new policy because he never asked her if she got new insurance, but instead he "just asked for an insurance policy number." *Id.*

Appellant also testified that she made a call to the insurance company on December 19, 2016. *Id.* at 99. She said she called because "Ms. La Rue did not ask [her] if anything happened from the time [Appellant's] insurance lapsed until [Ms. La Rue] got [Appellant her] new policy" and, consequently, Appellant was trying to let the insurance company know that her car had been wrecked before the new policy took effect. *Id.* at 99-100. She elaborated that she had a friend who failed to tell the "insurance company that her car was wrecked already. She was in an accident. And … they tried to charge her with insurance fraud because she didn't let the insurance company know her

vehicle was already wrecked." *Id.* at 99. Appellant denied that she was attempting to make a claim when she called, and said she described the time of the accident to the best of her ability. *Id.* at 100.

Appellant also testified that when Mr. Cesario, the investigator, came to her house, she thought he was coming "[b]ecause [she] called to tell [the insurance company] that [her] vehicle was wrecked. So I thought he [was] coming to look at it so that the insurance company knew [her] vehicle was wrecked when [she] got [her] insurance policy." *Id.* at 101. She said she ended the interview with him because he started to confuse her, and "the way he started asking … questions and everything, it didn't seem like the same thing [she] thought was going on[,] was going on." *Id.* at 101-02. Further, while Appellant conceded that the insurance company gave her a claim number, she maintained that she did not make a claim, and explained that "the insurance people kept trying to throw claim numbers on [her]." *Id.* at 107.

At the conclusion of trial, the jury found Appellant guilty of insurance fraud, and not guilty of false reports to law enforcement. The trial court found Appellant guilty of the summary offense of operating a vehicle without required financial responsibility. That same day, the trial court sentenced Appellant to 3 years' probation and 200 hours of community service for her insurance fraud conviction, and imposed a $300 fine on Appellant for operating a vehicle without required financial responsibility. Appellant did not file a post-sentence motion. She timely filed a notice of appeal, and timely complied

with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement.  She

presents a single issue for our review:

> I.   Whether the evidence is insufficient to sustain [Appellant's] conviction for [i]nsurance [f]raud when the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] called her insurance company with the intent to make an insurance claim and a specific intent to defraud the company?

Appellant's Brief at 4 (emphasis omitted).

> We apply the following standard of review to sufficiency claims:
>
> A challenge to the sufficiency of the evidence is a question of law, subject to plenary review.  When reviewing a sufficiency of the evidence claim, the appellate court must review all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as the verdict winner.  Evidence will be deemed to support the verdict when it establishes each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.  The Commonwealth need not preclude every possibility of innocence or establish the defendant's guilt to a mathematical certainty.  Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Teems*, 74 A.3d 142, 144-45 (Pa. Super. 2013) (citation

omitted).

Appellant challenges her conviction for insurance fraud under 18 Pa.C.S.

§ 4117(a)(2), which provides:

> **(a) Offense defined.**--A person commits an offense if the person does any of the following:
>
> ***
>
> (2) Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or

- 12 -

> misleading information concerning any fact or thing material to the claim.

18 Pa.C.S. § 4117(a)(2). "Statement" is defined as "[a]ny oral or written presentation or other evidence of loss, injury or expense, including, but not limited to, any notice, statement, proof of loss, bill of lading, receipt for payment, invoice, account, estimate of property damages, bill for services, diagnosis, prescription, hospital or doctor records, X-ray, test result or computer-generated documents." 18 Pa.C.S. § 4117(l).

Appellant points us to 18 Pa.C.S. § 302(b), which defines intentionally and knowingly, in relevant part, as follows:

> **(b) Kinds of culpability defined.—**
>
> (1) A person acts intentionally with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; …
>
> (2) A person acts knowingly with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; …

18 Pa.C.S. § 302(b)(1)(i), (b)(2)(i); **see also** Appellant's Brief at 13-14 (citing to 18 Pa.C.S. § 302(b)(1)(i), (b)(2)(i)).

Appellant argues that her "conviction for [i]nsurance [f]raud must be vacated because the Commonwealth failed to prove beyond a reasonable doubt that [she] intended to file an insurance claim or specifically intended to

- 13 -

defraud her insurance company when she reported her accident." Appellant's Brief at 13. She insists that "[n]o evidence was presented that [she] filed any paperwork related to a claim, followed up with the insurance company regarding a claim, obtained any quotes for repairing the damage to her vehicle, or otherwise took any action related to the purported claim after reporting the accident." *Id.* at 21. Appellant maintains that "it was the insurance company customer service representative, not [Appellant], who brought up filing a claim and initiated the process." *Id.* (citation omitted). She asserts that, "[i]n immediately purchasing a new insurance policy to replace one that had lapsed and subsequently reporting her accident to the company, [she] was simply trying to fulfill what she believed to be her obligations as an insured to update [her] insurance company with any pertinent history or damage to her vehicle." *Id.* (citation omitted). Further, Appellant contends that, "[w]hen confronted by Mr. Cesario … after reporting her accident, [Appellant], surprised and confused by the questioning, insisted that she had not made a claim and knew that the insurance policy did not cover the damage to her vehicle." *Id.* at 20 (citations omitted). Thus, Appellant urges that "[t]he evidence adduced at trial was insufficient to prove, beyond a reasonable doubt, that [she] had the specific intent to defraud her insurance company when she reported her accident." *Id.* at 22.

In contrast, the trial court and the Commonwealth submit that the evidence was sufficient to sustain Appellant's insurance fraud conviction. The trial court rationalized:

> The jury reasonably determined from the evidence admitted at trial that Appellant had been involved in an automobile accident, provided an expired insurance card to the police officer, then obtained new insurance without mentioning the earlier accident, gave the police officer information from her new insurance policy, called her new insurance company and initiated a claim under the new policy. From these facts, the jury could reasonably conclude that Appellant had the intent to defraud the insurer to cover an accident which occurred prior to the obtained coverage.

Trial Court Opinion (TCO), 11/30/2018, at 5. In a similar vein, the Commonwealth argues that "[t]he circumstantial evidence here was sufficient to support the jury's conclusion that [A]ppellant contacted the insurance company with the intent to make an insurance claim under her newly acquired policy, never telling anyone that the accident had occurred hours before the new policy went into effect, and therefore, was sufficient to support the conviction for insurance fraud." Commonwealth's Brief at 3.

We are constrained to conclude that the evidence was sufficient to support Appellant's conviction. To reiterate, the statute provides that a person commits an offense if he or she "[k]nowingly and with the intent to defraud any insurer…, presents or causes to be presented to any insurer … any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim." 18 Pa.C.S. § 4117(a)(2). Viewing the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner, **see Teems, supra**, we determine that the evidence sufficiently proved, beyond a reasonable doubt, that Appellant, knowingly and with the intent to defraud, presented to an insurer a statement in support of

a claim that contained false, incomplete or misleading information concerning a fact material to the claim. Here, Appellant made no indication to Officer Porter or Ms. La Rue that the accident occurred while she had no insurance. She subsequently contacted the insurance company, supplied her new policy number, failed to mention that the accident occurred prior to that policy taking effect, allowed a claim to be initiated on her behalf, and provided false, incomplete and/or misleading information regarding the time of the accident. Specifically, Appellant told the initial customer service representative that she received her new policy number on Saturday, and then later that day, was in an accident. *See* Commonwealth's Exhibit 4. This circumstantial evidence supports an intent to defraud. Moreover, as the Commonwealth points out, the jury rejected Appellant's alternative explanation for why she called the insurance company and accepted a claim number. *See* Commonwealth's Brief at 7. We therefore are constrained to affirm Appellant's conviction under the statute.

While we must apply the statute as written by our Legislature, we nevertheless express our concern over its breadth and application.[7] Initially, we observe that the record in this case does not demonstrate that Appellant affirmatively stated at any point that she wanted to make a claim, nor does it show that she continued to pursue the claim after reporting the accident — yet, the statute criminalizes her conduct. There is no evidence that Appellant

---

[7] We note that Appellant only raises a sufficiency claim, and does not advance any constitutional arguments.

explicitly asked to make a claim, submitted any billing statements to the insurance company, obtained an estimate on the cost of repairs, completed paperwork relating to the claim, or otherwise followed up on the status of it. *See* Appellant's Brief at 16, 19-20. The Commonwealth emphasizes — and the jury apparently credited— that Appellant accepted a claim number, but that arguably overlooks other functions of claim numbers, such as serving as a recordkeeping device. We fear that the broad reach of this statute may stifle insureds from reporting accidents and inquiring about coverage, particularly in scenarios where the facts of an incident are not clear-cut. We hope that the Commonwealth tempers the reach of this sweeping statute by exercising prosecutorial discretion.[8]

Judgment of sentence affirmed. Petition to withdraw granted.

Judges McLaughlin and Pellegrini concur in the result.

_____

[8] We acknowledge that the media has recently called attention to the prosecution of insurance fraud cases by the Allegheny County District Attorney's office, and the use of the criminal justice system for the benefit of insurance companies. *See* Kendall Taggart, "Insurance Companies are Paying Cops to Investigate Their Own Customers," BuzzFeed News (Aug. 15, 2019, 9:49 AM), https://www.buzzfeednews.com/article/kendalltaggart/insurance-fraud-erie-state-farm-farmers.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/2019